Eric T. Kanefsky (N.J. Bar No. 024292002)
Ralph J. Marra, Jr. (N.J. Bar No. 020761978)
Thomas R. Calcagni (N.J. Bar No. 044801997)
Martin B. Gandelman (N.J. Bar No. 015592011)
CALCAGNI & KANEFSKY LLP
1085 Raymond Boulevard, 14th Floor
Newark, New Jersey 07102
Telephone: (862) 397-1796
Fax: (862) 902-5458
eric@ck-litigation.com
rmarra@ck-litigation.com
tcalcagni@ck-litigation.com
mgandelman@ck-litigation.com

Sharon K. Robertson (N.J. Bar No. 30642006)
Christopher Bateman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
srobertson@cohenmilstein.com
cbateman@cohenmilstein.com

Daniel H. Silverman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street | Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

*Attorneys for the Mayor and City Council of
Baltimore and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> AXON ENTERPRISE, INC., and SAFARILAND, LLC <br><br> Defendants. | **CLASS ACTION COMPLAINT** <br><br> Jury Trial Demanded |

**TABLE OF CONTENTS**

I.      NATURE OF ACTION ...................................................................................... 1

II.     PARTIES ........................................................................................................ 10

III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE .......................... 10

IV.     ALLEGATIONS OF FACT SUPPORTING PLAINTIFF'S CLAIMS FOR RELIEF ........ 12

        A.      Relevant Markets and Monopoly Power ............................................... 12

                1.      BWC Systems – Product and Geographic Markets ...................... 12

                2.      Axon Exercises Monopoly Power Within the U.S. BWC Systems Market . 16

                3.      The BWC System Market Has High Barriers to Entry ................ 20

                4.      Long-Range CEWs – Product and Geographic Markets ............... 22

                5.      Axon Exercises Monopoly Power in the U.S. Long-Range CEW Market... 25

                6.      The Long-Range CEW Market Has High Barriers to Entry ......... 25

                7.      Product and Geographic Market – Long-Range CEW Holsters ......... 28

                8.      During the Life of the Holster Agreement, Safariland Exercised Monopoly Power over the Long-Range CEW Holster Market .................... 28

        B.      Axon and Safariland's Conduct to Monopolize the BWC System and Long-Range CEW Markets ............................................................................ 29

                1.      Before the Merger, Safariland Aggressively Competed with Axon in BWC Systems, Yielding Lower Prices and Other Benefits for Customers ........... 29

                2.      The Merger and Its Presumptive Illegality ................................... 31

                3.      Defendants' Conduct Has Caused Substantial Anticompetitive Effects  35

        C.      Lack of Countervailing Factors .......................................................... 42

                1.      High Barriers to Entry and Expansion ......................................... 42

                2.      Efficiencies ............................................................................... 43

        D.      The FTC Alleges the Merger Violates the Antitrust Laws ..................... 44

        E.      Defendants' Conduct Has Harmed the Class ....................................... 45

V.      CLASS ACTION ALLEGATIONS .................................................................. 45

VI.     TOLLING OF STATUTE OF LIMITATION ................................................... 48

VII.    CLAIMS FOR RELIEF .................................................................................. 48

Plaintiff the Mayor and City Council of Baltimore, on behalf of itself and all others similarly situated, makes the following allegations based on its own personal knowledge, information and belief, investigation of its counsel, and the complaint issued by the Federal Trade Commission ("FTC") in *In re Axon Enterprise, Inc.*, F.T.C. No. D9389 (Jan. 3, 2020) (the "FTC Complaint").

## I.    NATURE OF ACTION

1.    This is an action for damages and injunctive relief under the federal antitrust laws to redress injuries to competition caused by Axon Enterprise, Inc. ("Axon") and Safariland, LLC (Safariland) in the national markets ("the Markets") for body-worn camera ("BWC") systems and long-range conducted energy weapons ("CEWs") and associated equipment such as holsters (collectively, "the Products").

2.    BWCs are body-worn cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions.  BWCs operate in conjunction with accessories such as docking stations ("docks") and with digital evidence management systems ("DEMS"), the software component.  DEMS enable police departments to store body-camera data in a central location, redact non-relevant images such as the faces of bystanders, share pertinent evidence with prosecutors, and maintain chain of custody of the video for evidentiary use.  DEMS can also work with camera data from camera types other than BWCs, such as in-car cameras (which Axon also manufactures).  Together, BWCs, along with DEMS and accessories such as docks, comprise a BWC system.  Although the components of BWC systems may be purchased separately, many, if not most, police departments buy them all together along with related services such warranties, typically from the same manufacturer—for example, Axon.  Axon touts the efficiencies that come from using the products together.

3.    Long-range CEWs—which are virtually synonymous with Axon's dominant long-

range CEW, the Taser—are a type of "less-lethal" weapon, which is a class of weapons that can be used to deal with a threat to the public, bystanders, or police, from violent or armed individuals without resort to deadlier weapons such as firearms.  Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[1]  Long-range CEWs are CEWs that can be used accurately on a single individual up to 35 feet away.

4.     In May 2018, Axon, already by far the dominant maker and supplier of BWC systems and long-range CEWs, brazenly enlarged and entrenched its monopoly power in these markets by acquiring its largest and most vigorous competitor in the BWC systems market, VieVu, LLC ("VieVu"), from Safariland (the "Merger").   As part of the deal, Axon and Safariland further entered into various related anticompetitive agreements with each other, which, among other things, prohibited Safariland from competing with Axon in the BWC systems and long-range CEW markets for a decade or more and suppressed competition in the long-range CEW holster market.  The Federal Trade Commission ("FTC") has challenged the Merger and its related agreements as anticompetitive and unlawful, alleging that the Merger violated Section 7 of the Clayton Act as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.[2]  Section 7 of the Clayton Act prohibits acquisitions the effect of which "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.

5.     BWCs have been described as "a powerful tool for increasing transparency and

---

[1]  *How Conducted Energy Devices Work*, Nat'l Inst. of Just. (June 22, 2008), https://nij.ojp.gov/topics/articles/how-conducted-energy-devices-work.

[2] Compl. at ¶¶ 58, 60, *In re Axon Enter., Inc.*, F.T.C. No. D9389 ("FTC Compl.").

accountability for officers, the public and for police officials."[3]  For example, a 2020 report by a federal monitor appointed to oversee reforms of policing practices by the New York City Police Department (NYPD) found that officers who wore the devices were more likely to accurately report pedestrian stops they made under the department policy known as stop-and-frisk.[4]  The American Civil Liberties Union has stated that police cameras "have the potential to be a win-win, helping protect the public against police misconduct, and at the same time helping protect police against false accusations of abuse."[5]

6.      In part hoping to realize these benefits, many local governments and agencies around the country have invested significant sums of money—often tens of millions of dollars—to purchase Axon BWC systems in recent years.  Yet ever since and because of Axon's anticompetitive acquisition of VieVu, these governments and agencies have overpaid substantially for these BWC systems and related services.  They have also been deprived of the added innovation in BWC systems that would have occurred but for the Merger.

7.      The Merger eliminated direct and substantial competition between Axon and VieVu, which Axon described as the "#2 competitor."  This reduced competition allowed Axon to increase prices for BWC systems, and also suppressed output and innovation.

8.      Before the Merger, VieVu aggressively challenged Axon for the sale of BWC systems to police departments in the United States.  This competition resulted in substantially lower prices and provided customers with robust features and significant improvements.  For

---

[3] Ashley Southall, *Police Body Cameras Cited as 'Powerful Tool' Against Stop-and-Frisk Abuses*, The New York Times (Nov. 30, 2020), https://www.nytimes.com/2020/11/30/nyregion/nypd-body-cameras.html

[4] *Id.*

[5] Jay Stanley, *Police Body-Mounted Cameras: With Right Policies in Place, a Win for All*, American Civil Liberties Union (Mar. 2015), https://www.aclu.org/other/police-body-mounted-cameras-right-policies-place-win-all

example, Axon told its Board in May 2018 that the "VieVu business strategy [was to] [u]ndercut on price."[6]  VieVu also focused on improving its products in part because Axon "is aggressively pushing feature set and existing customers are demanding those features."

9.      The competition between Axon and VieVu was intense.  VieVu was successful in winning accounts at prices well below Axon's for several large police departments.  The competition between the two rivals became especially intense after VieVu won a contract with the New York City Police Department ("NYPD")—by far the largest municipal police department in the country—with a bid that was *62%* lower than Axon's.  VieVu's former General Manager acknowledged that "[w]e started a price war."[7]  Axon's CEO testified that, after losing the contract, Axon made a free offer of 1,000 BWCs to New York City.  Axon eventually expanded its promotion, on or around April 5, 2017, when it offered free BWC systems for one year to every police agency in the United States.  Axon's CEO also admitted that part of its reason for acquiring VieVu was to obtain the huge NYPD account.

10.      After and as a result of the Merger, customers lost the benefit of this head-to-head competition.  Axon began to tout its pricing power, enacting "substantial price increases," including on BWCs and on Tasers, according to a source cited in the FTC's complaint.[8]  This is exactly what VieVu's owner before the Merger, Safariland, predicted would happen because of the Merger, stating, "I believe this will greatly improve their ability to increase price in the BWC and I can easily see [Axon's] stock lifting by 20% or more."[9]  (Axon's stock price actually increased by more than 40% in the month following the acquisition, far more than the broader

---

[6] FTC Compl. ¶ 3.

[7] *Id.* ¶ 5.

[8] *Id.* ¶ 42.

[9] *Id.* ¶ 6.

U.S. stock market.)

11.     The prices Axon charges for BWC systems have shot up astronomically since and as a result of the Merger.  One need hardly look further than Axon's own reported sales and revenue data in its SEC filings to see this dramatic effect.  Axon's 10-K filings show that its average selling price for BWCs actually *declined* from $195.17 in 2016 to $169.07 in 2017, while VieVu was intensely competing with it, even as Axon's annual BWC unit sales increased. But in 2018, the year of the Merger, Axon's average BWC selling price jumped by ***34%*** to ***$254.56***.  The average price relentlessly continued to increase after that, to ***$290.69*** in 2019, ***$313.09*** in 2020, ***$415.52*** in 2021, and ***$489.80*** in 2022—a nearly ***threefold*** increase from 2017, as illustrated by the following graph:



12.     Axon has admitted in its SEC filings to such "increase[s] in the average sales price" for its BWC system components since the Merger.  Moreover, Axon's reported gross margins on BWCs follow a nearly identical trend, increasing every year from 2017 to 2022 (after declining from 2016 to 2017), jumping nearly ***fourfold*** over that period, indicating that these price increases cannot be explained by increasing costs:

6



13.     In addition to increasing prices, Axon limited the availability of VieVu BWC systems to customers and stopped developing new generations of VieVu hardware and software.

14.     The Merger has entrenched Axon's already dominant share of the BWC systems market and significantly increased market concentration.  Pre-Merger, Axon was described by one Wall Street analyst as already controlling approximately 60% to 80% of the market for BWC systems.[10]  For its part, VieVu had hundreds of BWC system contracts with police agencies around the country, including the NYPD and other major police departments, such as Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado.

15.     Under the Merger, Axon swallowed up VieVu's BWC system contracts.[11] Another analysis concluded that, immediately after and as a direct result of the Merger, Axon

---

[10] Luke Schiefelbein, *Why Taser Stock Could Have Shocking Upside*, Forbes (Mar. 13, 2018), https://www.forbes.com/sites/lukeschiefelbein/2018/03/13/why-taser-stock-could-have-shocking-upside/?sh=47c4b26077d7.

[11] Rich Duprey, *Axon Enterprise Now Owns the Police Body Cam Market*, the Motley Fool (May 18, 2018), https://www.fool.com/investing/2018/05/18/is-there-any-stopping-axon-enterprise-now.aspx.

"own[ed] **80%** of all big-city police department contracts."[12]   Axon boasted that "[a]s of the end of the second quarter of 2019, 48 of the 79 major city law enforcement agencies have purchased Axon body-worn cameras and/or its digital evidence management solution."[13]   Because Axon was so dominant among the very largest cities, including New York City, Axon's true share of large metropolitan police department purchases was likely even higher than 80%.

16.     Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points, renders a merger presumptively unlawful. According to the FTC Complaint, Axon's acquisition of VieVu resulted in an HHI above 2,500, and increased HHIs in an already concentrated market by well over 200 points.   Thus, the Merger is presumptively unlawful.

17.     The Merger also entrenched Axon's monopoly power in the long-range CEW market.  Before the Merger, Axon already controlled approximately 95% of this market.[14]  With the Merger, Axon further cemented that dominance by extracting an agreement from Safariland, a potential competitor in the long-range CEW market, not to compete in that market for *12 years*. Showing that Axon viewed entry by Safariland into the long-range CEW market as a real threat, Axon's CEO called this noncompete a "hidden jewel in the deal."[15]  As part of the Merger, Axon and Safariland further agreed to an anticompetitive deal whereby Safariland, a maker of holsters

---

[12] *Id.* (emphasis added).

[13] Axon, *Axon Media Press Kit*, PDF at 3, https://axon.cdn.prismic.io/axon%2F5e7d06a9-44f9-4d1f-a633-cdfa8795fea6_axon+media+press+kit+2019.pdf (last visited Oct. 6, 2023).

[14] Schiefelbein, *supra* note 10.

[15] FTC Compl. ¶ 46.

for long-range CEWs, would supply these holsters exclusively to Axon and serve as Axon's preferred supplier for the holsters.  Axon has further restricted competition and raised barriers to entry in the long-range CEW market through its long-term supply contracts with police departments, which typically last 5 to 12 years, and its practice of bundling BWC systems and long-range CEWs.

18.    New entry or repositioning by existing producers has not been and will not be timely, likely, or sufficient to counteract the anticompetitive effects of the Merger.  Barriers to entry in the BWC systems and long-range CEW markets are high because of the substantial upfront capital investment required, switching costs, Axon's long-term customer contracts and bundling, and the need for references from police departments.  With respect to BWC systems and DEMS, Safariland's then-Executive Vice President noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done."[16]

19.    Axon also cannot show that the Merger resulted in merger-specific efficiencies sufficient to outweigh the competitive harm caused by the Merger.  Axon did not analyze or anticipate efficiencies when deciding to acquire VieVu.

20.    The Merger and Defendants' other anticompetitive conduct thus substantially lessened competition, and tended to create a monopoly, in the Markets.  Defendants' conduct has harmed and continues to harm Plaintiff and others who have purchased the Products from Axon after the Merger, causing them to pay inflated prices, and reducing output and innovation in these markets with important public-safety and civil-rights ramifications.  Thus, Plaintiff brings this action to hold Axon and Safariland accountable for their violations of the federal antitrust

---

[16] *In the Police Body Camera Business, the Real Money's on the Back End*, Marketplace (Apr. 18, 2017), https://www.marketplace.org/2017/04/18/police-body-camera-business-real-moneys-on-the-back-end/.

laws.

## II.     PARTIES

21.     Plaintiff the Mayor and City Council of Baltimore ("City of Baltimore") is a municipality located in Baltimore, Maryland.  The City of Baltimore purchased millions of dollars' worth of BWC systems, long-range CEWs, long-range CEW holsters, and associated services such as warranties from Defendant Axon at supracompetitive prices during the Class Period.  As a result of Defendants' conduct, the City of Baltimore was injured in its business or property by reason of the violations of law alleged herein.

22.     Defendant Axon Enterprise, Inc. is a Delaware corporation, with its principal place of business in Scottsdale, Arizona.  Axon changed its name in 2017 from Taser International, Inc.

23.     Defendant Safariland, LLC is a limited liability company organized and existing under the laws of the State of Delaware.  Safariland is wholly owned by Cadre Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware.  Cadre Holdings' principal place of business is located at 13386 International Parkway, Jacksonville, Fla.

## III.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

25.     This Court has personal jurisdiction over Axon and Safariland because they transacted business, maintained substantial contacts, and committed overt acts in furtherance of their market-allocation conspiracy and conspiracy to monopolize the markets for BWC systems and long-range CEWs, as well as Axon's attempt to monopolize, or its actual monopolization of, the markets for BWC systems and long-range CEWs in the United States, including in this District. Axon and Safariland should, therefore, have foreseen the possibility of being brought

before this Court to answer for any illegal acts related to their business conducted here.

26.     Axon and Safariland's anticompetitive conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

27.     Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).   Defendants transacted business or acted through subsidiaries or agents present in this District; a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

A.     Axon negotiated contracts with purchasers in this District to provide BWC systems, Tasers, and Taser components, including to members of the Class;

B.     Axon delivered BWC systems, Tasers, and Taser components to purchasers in this District, including to members of the Class;

C.     Safariland delivered Taser holsters to purchasers in this district, including to members of the Class;

D.     Safariland provided Taser holsters that Axon included in its contracts with purchasers and delivered to purchasers in this District, including to Members of the Class.

28.     Axon markets and delivers BWC systems, long-range CEWs, and long-range CEW components to purchasers across state lines.   Axon makes and receives substantial payments across state lines for and from the sale of BWC systems, long-range CEWs, and long-range CEW components, and Axon's business activities that are the subject of this Complaint are

within the flow of, and have substantially affected, the interstate commerce of the United States. During the Class Period, Axon used the instrumentalities of interstate commerce, including interstate wires, in furtherance of its conspiracy to monopolize the markets for BWC systems and long-range CEWs as well as its attempted or actual monopolization of the markets for BWC systems and long-range CEWs.

29.     Safariland markets and delivers long-range CEW holsters to purchasers across state lines.  Safariland makes and receives substantial payments across state lines for and from the sale of long-range CEW holsters, and Safariland's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States.  During the Class Period, Safariland used the instrumentalities of interstate commerce, including interstate wires, in furtherance of its conspiracy to monopolize the markets for long-range CEWs and BWC systems.

## IV.     ALLEGATIONS OF FACT SUPPORTING PLAINTIFF'S CLAIMS FOR RELIEF

### A.     Relevant Markets and Monopoly Power

30.     The relevant markets in which to analyze the effects of Defendants' conduct are the sale of (1) BWC systems, (2) long-range CEWs, and (3) long-range CEW holsters – all in the United States.   A hypothetical monopolist in any of these markets would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

### 1.     BWC Systems – Product and Geographic Markets

31.     BWCs are cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions.  Axon's BWCs include the Axon Body and the Axon Flex.  The Body is a one-piece camera typically worn on the chest.  The Flex is a two-part system with a smaller camera piece that can be mounted on eyewear.

32.     BWCs operate in conjunction with associated hardware including docks and with DEMS, the software component.  Together, these components form an integrated BWC system.

33.     DEMS enable police departments to store body camera data in a central location, redact non-relevant images such as the faces of bystanders, share pertinent evidence with prosecutors, and maintain chain of custody of the video for evidentiary use.  Axon's DEMS is called Axon Evidence and uses the website name Evidence.com.  DEMS can also work with camera data from camera types other than BWCs, such as in-car cameras.  Axon's DEMS, for example, also works with its in-car camera, the Fleet.

34.     Docks are hardware that connect to BWCs for purposes such as charging the BWCs' batteries and uploading data (including video footage) from the BWCs onto a computer or cloud-based server system.  Axon sells docks for its BWCs under the brand name Axon Dock (the "Dock").  According to Axon, the Dock provides for the intuitive uploading of data from Axon BWCs to Evidence.com, allows recharging of Axon BWC batteries, and acts as a mechanism to ensure Axon BWCs receive and operate the most updated firmware.[17]

35.     Axon also sells services such as warranties related to BWC systems.  For example, Axon sells a Technology Assurance Plan (formerly known as the Taser Assurance Plan) for its BWCs and docks, which includes warranty coverage for several years, spare BWCs or docks, and replacement or upgrade BWCs or docks after several years.

36.     Although the components of BWC systems may be purchased separately, many, if not most, police departments buy them all together, typically from the same manufacturer—for example, Axon.  Police departments frequently issue requests for proposals seeking to purchase

---

[17] *Axon Device and On-Premise Security*, Axon Trust Center, https://www.axon.com/axon-dock-security (last visited Oct. 6, 2023).

BWC system components together as part of an integrated BWC system.  The products are closely related, and it is important for them to interoperate effectively.  Indeed, Axon requires police departments to integrate Axon BWCs with Evidence.com, Axon's DEMS, because Axon body cameras only work with Evidence.com.[18]  Axon touts the efficiencies that come from using the products together, for example stating that "[a]ll technologies" in one bundled offering that includes BWCs, Docks, and DEMS "work together to deliver unprecedented efficiency and impact."[19]  Axon similarly states that Axon BWCs are "fully integrated with the growing Axon network [including DEMS] to give you better evidence capture and management."[20]

37.     There are no reasonably interchangeable substitutes for BWCs systems.  Police departments could not realistically switch to other products in the face of a SSNIP for any of these products.  Other recording systems, such as in-car camera systems, cannot record interactions outside of the view of the car, or when officers patrol on foot or bicycle.  Further, seven states now require law enforcement to use body cameras while on duty.[21]  In-car cameras also tend to be more expensive than body cameras.  According to the FTC, Axon's Chief Revenue Officer has testified that in-car systems and BWC systems are not good substitutes.[22]

38.     A relevant submarket within the market for BWC systems is the submarket for sales of BWC systems to large, metropolitan police departments.  BWCs are particularly useful to police officers in such departments, who often patrol on foot.

39.     Records Management Systems ("RMS") are not substitutes for DEMS.  RMS

---

[18] *In the Police Body Camera Business, the Real Money's on the Back End*, *supra* note 16.

[19] *Officer Security Plan*, Axon, https://www.axon.com/products/osp (last visited Oct. 6, 2023).

[20] *Axon Body 2*, Axon, https://www.axon.com/products/axon-body-2 (last visited Oct. 6, 2023).

[21] *Body-Worn Camera Laws Database*, Nat'l Conf. of State Legislatures (Apr. 30, 2021), https://www.ncsl.org/civil-and-criminal-justice/body-worn-camera-laws-database.

[22] FTC Compl. ¶ 24.

collect and centralize in one source, in digital format, the many types of written reports generated by police agencies, including arrest, probation, and crime scene reports, whereas DEMS are designed principally to record video and audio evidence captured by BWCs. Industry participants do not view RMS as a substitute for BWC systems or for the DEMS component of those systems.

40.    BWC system use is widespread. In 2022, nearly half of police departments in the United States used body cameras, and seven states currently have laws requiring police officers to use them. And where police departments use body cameras, over 90% of prosecutors use body camera evidence to prosecute civilians—so police departments' operations depend on having body camera footage integrated into their evidence system.[23]

41.    The relevant geographic market is customers in the United States. The relevant market is a bid market in which it is possible to price discriminate to specific customers. Customers based in the United States cannot arbitrage or substitute based on different prices offered to customers outside the United States, including because of differing laws and rights for evidence collected from body cameras outside of the United States.

42.    Many police departments also are required to comply with the FBI's Criminal Justice Information Service ("CJIS") standards. CJIS compliance requires storing BWC-generated data in the United States. Additionally, U.S.-based police departments look mostly to other U.S.-based police departments to vet potential BWC system vendors.

43.    A hypothetical monopolist in the market for BWCs systems would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price

---

[23] Lily Robin & Susan Nembhard, *What Can Policymakers Expect of Body-Worn Cameras in Law Enforcement after a Decade of Use?*, Urban Inst. (July 14, 2022), https://www.urban.org/urban-wire/what-can-policymakers-expect-body-worn-cameras-law-enforcement-after-decade-use.

("SSNIP") in this market.  This is evident from Axon's own reported financial data, which, as noted above, shows that Axon significantly increased its annual unit sales of BWCs from 2017 to 2022 even as it raised their average price nearly *threefold* over that period and profit margins also increased.

> **2.      Axon Exercises Monopoly Power Within the U.S. BWC Systems Market**

44.     At all relevant times, the U.S. market for BWC systems has been highly concentrated and dominated by one player—Axon.

45.     Before the Merger, Axon was described by one Wall Street analyst as controlling approximately 60% to 80% of the market for BWC systems.[24]  A Huffington Post article from April 2017 reported that Axon "has already provided gear and service to more than 85 percent of major cities that have adopted body cameras."[25]

46.     VieVu was the next largest competitor by market share.  Before the Merger, VieVu had hundreds of BWC system contracts with police agencies around the country, including at least five of the 69 major U.S. metropolitan agencies composing the Major Cities Chiefs Association ("MCCA"), a professional organization of police executives representing the largest cities in the United States and Canada.  These five were New York City; Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado.  VieVu's contract with New York City in particular would have significantly boosted its market share as measured by

---

[24] Schiefelbein, *supra* note 10.

[25] Ryan J. Reilly & Nick Wing, *The Company Formerly Known as Taser Goes All In On Police Body Cameras*, The Huffington Post (Apr. 5, 2017), https://www.huffpost.com/entry/taser-axon-body-cameras_n_58e3d79ce4b0f4a923b29722.  An analysis conducted in November 2017 by The Leadership Conference on Civil and Human Rights found that 62 of 69 major city police departments in the U.S. had BWC programs with policies in place with respect to BWCs at that time.  *Police Body Worn Cameras: A Policy Scorecard*, The Leadership Conference (Nov. 2017), https://www.bwcscorecard.org/.

output and revenue.

47.     Post-Merger, the BWC systems market has been even more highly concentrated. Under a bullet point regarding Axon's "Software and Sensors" business segment, which includes BWC systems, Axon's 10-K for the year ending 2018 stated that "[o]f the 69 largest metropolitan area police departments in the U.S., 46 are on the Axon network"—fully two-thirds of these departments.   A December 2019 Axon investor presentation represented that Axon BWC systems controlled 47 of the 69 U.S. Major City Chiefs Agencies:



The chart shows that 10 of these 69 agencies did not have a BWC contract at all.  Thus, Axon reported controlling 47 of the 59 relevant agencies as of December 2019, i.e., *80% of them*.[26] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies.[27]

---

[26] Consistent with this figure, an analysis published by investment advice website The Motley Fool concluded that, immediately after and as a direct result of the Merger, Axon "own[ed] 80% of all big-city police department contracts." Duprey, *supra* note 11.

[27] Akela Lacy, *Two Companies Fight To Corner The Police Body Camera Market*, The Intercept (Dec. 8, 2021), https://theintercept.com/2021/12/08/police-reform-body-cameras-axon-motorola/.

48. Measured in terms of output or revenue, Axon's market share among large U.S. cities is even higher than 80%—likely at least 85%. This is indicated by another chart from the same presentation, showing Axon BWC systems' dominance in terms of U.S. Major City Chief Agencies ranked by size, starting with New York City at the top left, then moving downward and spilling over into the subsequent columns, with the smallest agency in the chart being Salt Lake City, at bottom right:



## Serving the top tier (Major City Chiefs)

| | | |
|---|---|---|
| New York City, New York | Baltimore, Maryland | Oklahoma City, Oklahoma |
| Chicago, Illinois | Charlotte-Mecklenburg, North Carolina | Cincinnati, Ohio |
| Los Angeles County, California | Atlanta, Georgia | El Paso, Texas |
| Los Angeles, California | Indianapolis, Indiana | Tucson, Arizona |
| Philadelphia, Pennsylvania | Cleveland, Ohio | Buffalo, New York |
| Houston, Texas | Fairfax County, Virginia | Tampa, Florida |
| Washington D.C. | Prince George's Co, Maryland | Portland, Oregon |
| Detroit, Michigan | Fort Worth, Texas | Minneapolis, Minnesota |
| Las Vegas, Nevada | Kansas City, Missouri | DeKalb County, Georgia |
| Dallas, Texas | Denver, Colorado | Long Beach, California |
| Baltimore County, Maryland | Jacksonville, Florida | Albuquerque, New Mexico |
| Phoenix, Arizona | Nashville, Tennessee | Mesa, Arizona |
| Nassau County, New York | San Jose, California | Fresno, California |
| Miami-Dade, Florida | St. Louis, Missouri | Virginia Beach, Virginia |
| Suffolk County, New York | New Orleans, Louisiana | Omaha, Nebraska |
| Memphis, Tennessee | Tulsa, Oklahoma | Orlando, Florida |
| San Francisco, California | Newark, New Jersey | Raleigh, North Carolina |
| Milwaukee, Wisconsin | Louisville, Kentucky | Wichita, Kansas |
| Honolulu, Hawaii | Seattle, Washington | Sacramento, California |
| San Antonio, Texas | Montgomery County, Maryland | Aurora, Colorado |
| Boston, Massachusetts | Miami, Florida | Arlington, Texas |
| Columbus, Ohio | Austin, Texas | Oakland, California |
| San Diego, California | Pittsburgh, Pennsylvania | Salt Lake City, Utah |

☐ Axon network   ☐ Competitor   ☐ No cameras

As the chart shows, of the 69 Major City Chief members, Axon controlled 4 of the top 5, 7 of the top 10, and 15 of the top 20. In other words, Axon similarly dominated among the very largest U.S. agencies, which are much larger than the smaller MCCA agencies. According to available data, around this same time, New York City and Chicago alone accounted for approximately 31% of the total officers and non-sworn personnel of all U.S. MCCA members combined.[28]

---

[28] The MCCA says its members comprise a workforce of 222,973 officers and non-sworn personnel in the U.S. *Corporate Partnerships*, MCCA, https://majorcitieschiefs.com/corporate-partnerships/ (last visited Oct. 6, 2023). According to New York City, the NYPD has approximately

Assuming that New York and Chicago made up 31% of the market represented by the MCCA, and that the remaining 67 MCCA cities each represent an equal share of the remaining 69% of the market (a simplifying assumption), then according to the data from its December 2019 investor presentation, Axon had 85% of the market represented by the MCCA.

49.    Axon acknowledges its dominance—according to the FTC, in a company presentation, Axon implored its salespeople to "embrace being the gorilla," and Axon's CEO confirmed that Axon is a "really strong market leader."[29]

50.    Axon had monopoly power in the BWC systems market before the Merger.  The Merger further increased and entrenched Axon's monopoly power.

51.    In addition to being demonstrated by its market share, Axon's monopoly power is shown by its ability to profitably charge supracompetitive prices for BWC systems and their components, including the huge price increases Axon implemented after the Merger, and its high profit margins.[30]  In 2022, Axon reported $392 million in gross margin in its "software and sensors" department, driven primarily by sales of its BWC systems.  With $658 million in net sales from software and sensors, Axon generates a sky-high 60% profit margin from these BWC systems, an extremely high profit margin reflecting its monopoly power.[31]

52.    Motorola, Panasonic, and Utility largely make up the rest of the BWC system

---

36,000 officers and 19,000 civilian employees. *About NYPD*, NYPD, https://www1.nyc.gov/site/nypd/about/about-nypd/about-nypd-landing.page (last visited Oct. 6, 2023). Moreover, "The NYPD body-worn camera program is the largest in the United States with over 24,000 members of the Department equipped with body-worn cameras." *Body-Worn Cameras*, NYPD, https://www1.nyc.gov/site/nypd/about/about-nypd/equipment-tech/body-worn-cameras.page (last visited Oct. 6, 2023).  Chicago reported having 14,221 sworn and civilian members at the end of 2019. *Chicago Police Department 2019 Annual Report*, Chicago Police Department (2019), https://home.chicagopolice.org/wp-content/uploads/2019-Annual-Report.pdf.

[29] FTC Compl. ¶ 30.

[30] *See supra* ¶¶ 11-12; *infra* ¶¶ 120-125.

[31] 2023 Axon Enterprise, Inc. Form 10-K, at 39 (Feb. 28, 2023).

market.  As demonstrated by the dramatic price increases that Axon implemented after acquiring VieVu, none of these other competitors pose the same competitive constraint on Axon as did VieVu, and none were able to constrain the exercise of Axon's monopoly power.  These other competitors' BWC systems rarely provided significant competition to Axon in RFP processes conducted by police departments.  The chart included above from a December 2019 Axon investor presentation shows the meager market share these competitors had compared to Axon, with the closest competitor, Motorola, controlling only 7 of 69 U.S. Major City Chief Agencies compared to Axon's 47.[32]

### 3.    The BWC System Market Has High Barriers to Entry

53.    Axon's monopoly power over BWC systems also is durable because it benefits from significant barriers to entry.  These barriers include high capital investment, contract length, switching costs, integration, bundling, and sales relationships.

54.    First, the high capital investment it takes to build out a BWC system represents a significant barrier to entry.  Axon developed Evidence.com in 2009 and invested $233.8 million in research and development in 2022.[33] This large amount of capital necessary to develop and service an effective DEMS can be profitable only when costs are spread across a high number of BWC system users.  Because the high capital investment needed to develop and maintain a DEMS must be spread across BWC system users, new entrants to the BWC system market must capture a significant proportion of police department contracts to maintain profitability.

55.    Contract length remains another barrier to entry.  BWC system contracts can last

---

[32] *See supra* ¶ 47.

[33] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 31, at 42.

ten years or longer,[34] limiting the number of police departments with which BWC system suppliers can attempt to contract in any given year.  Given the significant capital investment needed to develop and maintain BWC systems, the inability to compete for most police departments at any one time due to contract length further renders market entry unprofitable for would-be competitors.

56.     Switching costs pose another barrier to entry.  BWC systems are complex, with police departments taking months to become fully trained on Evidence.com's capabilities, for example.  If a police department does switch BWC systems, it must incur significant IT and training costs in switching its body camera videos away from the DEMS.[35]  Further, police officers using BWCs also face high switching costs because police officers themselves use them habitually, and retraining police officer habits at scale is difficult.[36]

57.     Axon is well aware of these high switching costs: in 2017, it offered free body cameras to police departments, which came with a one-year trial subscription to Evidence.com.[37] Those "free" cameras enticed police departments into using the Axon BWC system, because Axon's body cameras work only with Axon software.  Safariland's then-Executive Vice President called the Axon offer for free body cameras a "Venus fly trap" and noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of

---

[34] *See, e.g.*, Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement.

[35] Schiefelbein, *supra* note 10.

[36] *Id.*

[37] Cyrus Farivar, *Taser Stuns Law Enforcement World, Offers Free Body Cameras to All US Police*, ArsTechnica (Apr. 5, 2017), https://arstechnica.com/tech-policy/2017/04/taser-announces-free-body-cameras-cloud-storage-to-all-us-cops-for-a-year/; Elizabeth Joh & Thomas Joo, *The Harms of Police Surveillance Technology Monopolies*, 99 Denv. L. Rev. Forum 1, 17 (2022).

once you're done."[38]

58.     This "free" Evidence.com subscription also served to entrench Axon's position in the long-range CEW market, since Evidence.com "seamlessly integrates" with Tasers.[39] This integration further locked purchasers into the Axon system for both long-range CEWs and BWC systems.[40]

59.     Because of these high switching costs, police departments seldom switch their BWC system provider from one supplier to another when a contract is renewed.

60.     As indicated by the above, product integration and bundling are another key barrier to entry.   Currently, Axon's BWC systems integrate with its Tasers, and police departments that want to integrate Taser data into their evidence software must use the Axon BWC system.  Many police departments use Axon to supply both long-range CEWs and BWC systems in the same contract. Axon has also bundled BWC systems and long-range CEWs in contracts with police departments.  BWC system competitors without long-range CEWs cannot compete for those police departments that want their BWC systems to integrate with long-range CEWs.

61.     Axon's relationships with police departments serve as another barrier to entry. Axon acknowledges as much, noting in SEC filings that its "sales force and strong customer relationships represent key strategic advantages."

### 4.      Long-Range CEWs – Product and Geographic Markets

62.     Long-Range CEWs are a type of "less-lethal" weapon, which is a class of weapons that can be used "to deal with a threat to the public, bystanders or police, from violent or armed

---

[38] *In the Police Body Camera Business, the Real Money's on the Back End*, *supra* note 16.

[39] *E.g.*, *Taser X26P*, Axon, https://www.axon.com/industries/federal/products/taser-x26p.

[40] Schiefelbein, *supra* note 10.

individuals . . . prior to it escalating to a level where firearms would otherwise have to be used."[41] Less-lethal weapons include CEWs (both long-range CEWs like Tasers and traditional CEWs like stun guns), pepper spray, tear gas, rubber bullets, and other types of riot gear, which are less likely to injure or kill their target.[42] Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[43]

63.     Long-range CEWs are highly differentiated from other types of less-lethal weapons because of their accuracy, effectiveness, and versatility. Unlike traditional stun guns or pepper spray, long-range CEWs can be used on targets up to 35 feet away.[44] Further, unlike other long- range less-lethal weapons like tear gas and rubber bullets, long-range CEWs are designed to be used on a single person and can be highly accurate up to more than 30 feet away.[45]

64.     Long-range CEWs themselves must be used in conjunction with components, including the electricity cartridges that supply the charge—which must be replaced each time the long-range CEW is fired—and holsters that secure the long-range CEW to the officer's duty belt. Police departments prefer to buy these components in an all-inclusive supply contract with the long-range CEW manufacturer, which saves the police departments time and resources compared

---

[41] *Competition Document: Advancing Less Lethal Weapons*, Defence & Security Accelerator UK Home Off. (2020), https://www.gov.uk/government/publications/competition-advancing-less-lethal-weapons/competition-document-advancing-less-lethal-weapons.

[42] Kelsey D. Atherton, *What 'Less Lethal' Weapons Actually Do*, Scientific Am. (June 23, 2020), https://www.scientificamerican.com/article/what-less-lethal-weapons-actually-do/.

[43] *How Conducted Energy Devices Work*, *supra* note 1.

[44] Joint Intermediate Force Capabilities Off., *Taser® X26™*, U.S. Dep't of Defense Non-Lethal Weapons Program, https://jnlwp.defense.gov/Current-Intermediate-Force-Capabilities/X26-Taser/ (last visited Aug. 18, 2023).

[45] Warren Wilson, *Why I Think the Taser 10 May Be the Most Effective Less Lethal Device in History*, Police1 (Feb. 12, 2023), https://www.police1.com/police-products/less-lethal/taser/articles/why-i-think-the-taser-10-may-be-the-most-effective-less-lethal-device-in-history-dmpdMBS5efSNTL6l/.

to buying component parts separately.

65.     Long-range CEW use is widespread.   As of 2018, two-thirds of police departments used long-range CEWs,[46] and as of 2020, an estimated 73% of police officers carried long-range CEWs when on duty.[47]   Axon bragged in a 2019 investor presentation that "17,000 out of 18,000 US police agencies procure Taser devices," adding, "[w]e estimate ~70% of US patrol officers carry a Taser device."[48]

66.     Because of long-range CEWs' differentiation from other less-lethal weapons, long-range CEWs are a vital tool for law enforcement, and they cannot be easily replaced by other less-lethal or lethal weapons.   Recognizing this differentiation, Tom Shea, the program director of the Police Graduate Studies Program at Seton Hall University and a former police lieutenant, "said it's hard to imagine not arming police with Tasers.  'When someone's holding a knife and is violent and obviously irrational and out of his mind on drugs, those are situations where Tasers are absolutely necessary, because otherwise, you're going resort [*sic*] to deadly force.'"[49] Currently and throughout the class period, no substitutes exist for long-range CEWs.

67.     For the same reasons that police officers prefer to use long-range CEWs over other types of less-lethal and lethal weapons, civilians interested in self-defense also prefer to use long-range CEWs: they enable civilians to incapacitate a would-be attacker at a safer distance and

---

[46] Laurel Wamsley, *Taser Changes Its Name to Axon and Offers Free Body Cameras for Police*, NPR: The Two- Way (Apr. 7, 2017), https://www.npr.org/sections/thetwo-way/2017/04/07/522878573/ we-re-more-than-stun-guns-says-taser-as-it-changes-company-name.

[47] Univ. of Mich. Inst. for Soc. Res., *Weapons Authorized for Full-Time Sworn Officers/Deputies: Conducted Energy Device (e.g. Taser)* (2020), https://www.icpsr.umich.edu/web/NACJD/studies/38651/ datasets/0001/variables/EQ_CED?archive=nacjd.

[48] *Investor Presentation, Axon Enterprise, December 2019* at 8, Axon Enterprise (December 2019).

[49] Ken Serrano, *Tasers, Hailed as a Way to Avoid Deadly Police Shootings, Are Seldom Used in NJ*, Asbury Park Press (Apr. 18, 2022), https://www.app.com/story/news/local/public-safety/2021/11/08/police-taser-gun-use-nj-how-often-fired/8572510002/.

more effectively than other CEWs and less-lethal weapons.

68.     The relevant geographic market for long-range CEWs is the United States, as importing long-range CEWs into the United States is impractical due to their regulation as a crime-control product.[50]

### 5.     Axon Exercises Monopoly Power in the U.S. Long-Range CEW Market

69.     Axon is effectively the sole player in the market for long-range CEWs, with an estimated 95% market share.[51]   Axon has no notable competitors in long-range CEW manufacturing, as only a handful—if any—police departments use non-Axon CEWs.

70.     Axon enjoys healthy profits from its Taser-branded CEWs, with a 63.3% gross margin in 2022.[52]  Axon also enjoys healthy profits selling necessary components to its Taser-branded CEWs, including batteries, mounts, and cartridges, which supply the electricity for the shock and must be replaced each time the weapon is fired.   In 2022, over 40% of Axon's Taser-related revenue derived from non-weapon sales, most of which was attributable to electricity cartridges.[53]

71.     Axon's high operating margins and market share show that the long-range CEW market is highly concentrated, with Axon exercising monopoly power.

### 6.     The Long-Range CEW Market Has High Barriers to Entry

72.     Axon's unlawful monopoly over long-range CEWs is durable because it benefits from significant barriers to entry.   The primary barriers to entry are contract length, bundling,

---

[50] *See* 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 31, at 11.

[51] Schiefelbein, *supra* note 10.

[52] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 31, at 41.

[53] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 31, at 39.

relationships with law enforcement, training costs, and patents.

73.     One barrier to entry for potential long-range CEW competitors is contract length. Typical supply agreements (including Axon's), which cover the weapons themselves, cartridges, holsters, training, and warranties (among other areas), last 5–10 years—sometimes up to 12 years.[54]  Moreover, Axon often supplies Tasers as part of larger police department supply contracts, which last similar durations and include supply of BWC systems and records management.[55]

74.     Would-be competitors are forced to wait out these lengthy long-range CEW supply contracts to have even a chance at winning meaningful business, disincentivizing others from entering the market.  Further, because Axon includes long-range CEWs in its general supply contracts, companies must provide both long-range CEWs and BWC systems to compete for those police departments that prefer to integrate their long-range CEW and BWC system supply.

75.     As described above with respect to BWC systems Axon's relationships with police departments serve as another barrier to entry.[56]  Long-range CEWs are supplied to police departments by direct sales representatives through supply contracts.[57] Because long-range CEWs are such critical weapons used in life-or-death situations, police departments need to trust in the long-range CEW supplier to provide effective, useful weapons.  Axon's long-tenured sales force "has a customer relationship with over 95% of state and local law enforcement agencies in

---

[54] *See, e.g.*, Emily Wolf, *Fort Worth City Council unanimously approves $74 million police technology contract*, Fort Worth Report (Apr. 26, 2022), https://fortworthreport.org/2022/04/26/fort-worth-city-council-unanimously-approves-74-million-police-technology-contract/.

[55] *See, e.g.*, Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement, *supra* note 34.

[56] *See supra* ¶ 61.

[57] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 31, at 7.

the United States," which has been able to build trust in Axon's Taser-branded CEWs.[58]  Would-be competitors would need to build trust in their alternative long-range CEWs with police departments, an endeavor that would take considerable time and resources.  Axon acknowledges as much, noting that its "sales force and strong customer relationships represent key strategic advantages."[59]

76.     Training costs represent another barrier to entry.  Axon includes Taser training in its typical supply contracts,[60] and police departments that provide Tasers have trained a significant proportion of police officers in Taser use and protocol.[61]  Would-be competitors wishing to sell their own long-range CEWs would need to entice police departments to retrain their police force to use a new type of long-range CEW.

77.     Axon's nearly 300 U.S. patents covering its products, including Tasers, form another barrier to entry.[62]  Axon is unafraid to enforce its patents and has instituted numerous lawsuits against would-be competitors, most involving its Tasers.

78.     One would-be competitor, Robert Gruder, attempted to launch competing long-range CEW companies Stinger Systems and Karbon Arms.  Both times, according to Gruder, Axon "sued [the companies] out of business."[63]

79.     Regulations pose a final barrier to potential new entrants, which must ensure their

---

[58] *Id.*

[59] *Id.*

[60] *See, e.g.*, Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement, *supra* note 34.

[61] Aaron Smith, *Axon Is Watching You, and Seeing a Bright Future in Police Cameras and Tasers*, Forbes (Feb. 10, 2021), https://www.forbes.com/sites/aaronsmith/2021/02/10/axon-is-watching-you-and-seeing-a-future-in-police-cameras-and-tasers/?sh=4aa385af5228.

[62] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 31, at 39.

[63] Matt Stroud, *Meet the Company Trying to Break the Taser Monopoly*, Verge (Feb. 13, 2018), https://www.theverge.com/2018/2/13/17007376/axon-taser-monopoly-digital-ally-wireless.

long-range CEWs comply with a variety of state and local laws governing less-lethal weapons.

### 7.   Product and Geographic Market – Long-Range CEW Holsters

80.   Long-range CEW holsters are an essential component to long-range CEWs.  To be used effectively, long-range CEWs must deploy within a matter of seconds.  A holster helps an officer or civilian deploy a long-range CEW quickly by attaching it securely to her belt or person, while keeping the device accessible for use.[64]  Holsters are also essential to help police differentiate between a CEW and a firearm, so that police officers do not mistake a gun for a CEW in high-pressure situations.[65]  Further, many police departments require officers to carry their long-range CEW in a holster.[66]

81.   Because of these regulations and applications, long-range CEW holsters cannot be substituted with any other products that could secure a long-range CEW.

82.   The relevant geographic market for long-range CEW holsters is the United States.

### 8.   During the Life of the Holster Agreement, Safariland Exercised Monopoly Power over the Long-Range CEW Holster Market

83.   Because Axon faces effectively no competition in the long-range CEW market, the long-range CEW holster market is defined by those companies that can supply holsters for Axon's Tasers.[67]

84.   Most police departments purchase their long-range CEW holsters as part of a supply agreement with Axon for the Tasers themselves. Police departments prefer to purchase

---

[64] *Taser Holsters*, Galls, https://www.galls.com/taser-holsters (last visited Aug. 18, 2023).

[65] Sean Murphy, *Explainer: How Does Someone Confuse a Gun for a Taser?*, AP News (Dec. 22, 2021),   https://apnews.com/article/death-of-daunte-wright-science-shootings-minnesota-minneapolis-44798cda3cc0f093de20f54dabec4dec.

[66] *Id.*

[67] FTC Compl. ¶ 13.

holsters through supply contracts because it saves time and resources compared to buying component parts separately.

85.     From May 3, 2018 to April 17, 2020, the Holster Agreement was in place, making Safariland the preferred holster supplier of Axon's long-range CEWs. In effect, the parties agreed through this Holster Agreement for Safariland to be the preferred holster supplier for *all* long-range CEWs.

86.     Because of the Holster Agreement, Safariland obtained a monopoly over long-range CEW holsters, with high barriers to entry because other companies were contractually limited in their ability to work with Axon to produce holsters for Tasers.

### B.     Axon and Safariland's Conduct to Monopolize the BWC System and Long-Range CEW Markets

#### 1.     Before the Merger, Safariland Aggressively Competed with Axon in BWC Systems, Yielding Lower Prices and Other Benefits for Customers

87.     Axon and Safariland have engaged in anticompetitive conduct to entrench Axon's monopolies in the BWC system and long-range CEW markets.

88.     In 2018, before the Merger, as described above, Axon dominated both the long-range CEW market and the BWC system market, with 95% market share in long-range CEW supply to police departments and approximately 70%-85% market share in BWC system supply.[68] Showcasing Axon's dominance, an Axon company presentation from the time asked its salespeople to "embrace being the gorilla."[69]

89.     VieVu was Axon's closest and most serious competitor in the BWC system market.  For example, Safariland acknowledged: "We own the #2 player in the market, and to

---

[68] Schiefelbein, *supra* note 10.

[69] FTC Compl. ¶ 30.

date we have seen no other credible market entrant," and "VieVu and Taser are consistently the finalists in major opportunities." Axon's Vice President of Investor Relations touted that by purchasing VieVu, Axon had "acquired #2 competitor."

90.    Stock analysts and the financial press also recognized that VieVu was Axon's most significant competitor.  A Raymond James stock report stated: "In May 2018, Axon closed the $7.1 million strategic tuck-in acquisition of its most formidable body cam competitor, VieVu."[70]  A Bloomberg article dated May 4, 2018, titled "The Biggest Police Body Cam Company Is Buying Its Main Competitor," declared that "[t]he combination of the two largest providers of the recording devices will create a dominant force in police surveillance."[71]  A May 18, 2018 article from the Motley Fool, titled "Axon Enterprise Now Owns the Police Body Cam Market," observed that "[t]here is going to be no stopping Axon Enterprise . . . now that it has acquired its main body camera rival VieVu."[72]

91.    Before the Merger, VieVu and Axon were the competitors that could best satisfy the RFP requirements, from both a technical and price perspective, for many of the police agencies in the United States.  A number of police agencies found that, of multiple bidders, Axon and VieVu had the best offerings by a significant margin.

92.    Axon and VieVu vigorously and consistently competed on price in an effort to win police department contracts. After Respondent Safariland acquired VieVu in 2015, VieVu lowered its pricing in an explicit effort to take market share from Axon. VieVu's former General Manager confirmed that in early 2016, VieVu "made a relatively deliberate decision to take price

---

[70] FTC Compl. ¶ 37.

[71] Joshua Brustein, *The Biggest Police Body Cam Company Is Buying Its Main Competitor*, Bloomberg (May 4, 2018), https://www.bloomberg.com/news/articles/2018-05-04/the-biggest-police-body-cam-company-is-buying-its-main-competitor.

[72] Duprey, *supra* note 11.

down in the market considerably," and VieVu admittedly "took [Axon] by surprise with disruptive pricing and nearly comparable technology." As late as 2018, VieVu's strategy was to "win on price," including specifically to charge "less than Axon."[73]

93.     Competition between Axon and VieVu resulted in substantially lower prices for police departments.   A number of cities received substantially lower bids from VieVu as compared to Axon.  For example, in a blind bidding process, VieVu's bid for the NYPD contract was *$6.4 million* compared to Axon's *$17 million.*

94.     VieVu's lower pricing caused Axon to reduce its own bids.  VieVu at times responded to Axon's competing bids by offering better terms.

95.     Axon and VieVu also competed vigorously on non-price aspects of BWC systems, including the development of various innovative features such as auto-activation of BWCs in the event of an officer unholstering a gun or Taser, and computer-assisted facial redaction tools for DEMS videos.  Consumers benefited from this innovation competition.

### 2.      The Merger and Its Presumptive Illegality

96.     Pursuant to the Merger Agreement, Axon consummated the purchase of VieVu from Safariland on May 3, 2018.

97.     Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful.[74]  HHIs

---

[73] FTC Compl. ¶ 39.

[74] DOJ & FTC, *Horizontal Merger Guidelines* 19 (2010).  The DOJ and FTC have released draft merger guidelines, which presume anticompetitive any merger that increases HHI by more than 100 points and results in a market HHI greater than 1,800.  DOJ & FTC, *Draft Merger Guidelines* 7 (2023).

are calculated by totaling the squares of the market shares of every firm in the relevant market. The Merger significantly increased concentration in the U.S. BWC system market.

98.     Since the Merger, one firm, Axon, has controlled an estimated 85% of the BWC system market as measured by output or revenue.  According to the FTC Complaint, the Merger resulted in a post-Merger HHI in excess of 2,500, and increased concentration by more than 200 points—a conclusion further supported by the market share analysis contained herein.[75] Therefore, the Merger is presumptively anticompetitive under the Merger Guidelines and applicable case law.

99.     In its 10-K for fiscal year 2018, Axon reported the total purchase price as $17.6 million.  The consideration Axon paid included $5.0 million in cash; $2.4 million, or 58,843 shares, of Axon common stock issued to Safariland, contingent consideration of up to $6.0 million, or 141,226 additional shares of Axon common stock, if certain conditions were met (the fair value of which as of the acquisition date was $5.8 million, according to Axon), and the Holster Agreement.  Pursuant to the Holster Agreement, Safariland agreed for 10 years, *inter alia*, to develop a new CEW holster for Axon's next-generation CEW and to supply CEW holsters exclusively to Axon. Axon agreed, *inter alia*, to make Safariland its preferred supplier of

---

[75] While the FTC's HHI analysis seems to be based on an alleged market limited to "large, metropolitan police departments," there is no reason to think that Axon's market share is any lower for the broader relevant market alleged herein, especially given the disproportionate size of larger police departments among the overall U.S. police department population.  For example, in its 2020 10-K, Axon boasted that it had "dedicated sales representatives for the 1,200 largest agencies, which account for 70% to 80% of U.S. law enforcement patrol officers."  Likewise, as of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies, or 94%. Lacy, *supra* note 27. With approximately 36,000 officers, the NYPD alone accounts for around 7.6% of total full-time sworn officers employed by the approximately 11,800 general-purpose local police departments in the U.S. *About NYPD*, *supra* note 28; *Local Police Departments Personnel, 2020*, U.S. Dep't of Just. (Nov. 2022), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/lpd20.pdf.  Thus the Merger (which gave Axon control over the New York City contract among many others) significantly increased HHI in the relevant market alleged herein as well.

CEW holsters.  According to Axon, the estimated fair value of the Supply Agreement as of the acquisition date was $4.5 million.

100.    Axon and Safariland also agreed, as part of the Merger Agreement and Holster Agreement, to several noncompete agreements related to the Markets.  According to the FTC's complaint, the noncompete agreements are contained in the Merger Agreement itself and in Exhibit E, the Holster Agreement.[76]

101.    In Section 5.03(a) of the Merger Agreement, Safariland agreed not to engage in "(a) body worn video products and services, (b) in-car video products and services, (c) digital evidence management products and services provided to third parties that ingest digital evidence audio and video files, and (d) enterprise records management systems provided to third parties," anywhere in the world for 10 years.

102.    In Section 15.1 of the Holster Agreement, Safariland further agreed not to compete in the "CEW industry, BWC industry, fleet or vehicle camera industry, surveillance room camera industry, and digital evidence management system and storage industry, with regard to law enforcement, military, security or consumers," anywhere in the world for 12 years.

103.    According to the FTC complaint, "Respondent Axon was concerned about Respondent Safariland potentially entering into competition with Respondent Axon's lucrative [long-range] CEW business. Respondent Axon's CEO called the 12-year CEW non-compete a 'hidden jewel in the deal.'"[77]  Axon's CEO's comment demonstrates that Axon viewed the CEW noncompete as having significant value for Axon.  This could only be the case if Axon believed that Safariland would otherwise be a *bona fide* potential competitor in the long-rage CEW

---

[76] FTC Compl. ¶ 12.

[77] FTC Compl. ¶ 46.

market.

104.     In Section 5.03(c) of the Merger Agreement, Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting business or services away from Axon, for 10 years.

105.     In Section 15.3 of the Holster Agreement, Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting CEW, CEW holster, or CEW accessory business or purchases away from Axon, for 11 years.

106.     In Section 5.03(b) of the Merger Agreement, Safariland agreed not to hire or solicit any of Axon's employees, or encourage any employees to leave Axon, or hire certain former employees of Axon, except pursuant to a general solicitation.  Safariland agreed to refrain from these activities for 10 years.

107.     In Section 5.06(a) of the Merger Agreement, Axon agreed not to hire or solicit any of Safariland's employees, or encourage any employees to leave Safariland, or hire certain former employees of Safariland, except pursuant to a general solicitation. Axon agreed to refrain from these activities for 10 years.

108.     In Section 15.4 of the Holster Agreement, Respondents Axon and Safariland agreed not to solicit each other's employees for the purpose of inducing the employees to leave their respective employers, except pursuant to a general solicitation.  Respondents Axon and Safariland agreed to refrain from this activity for 11 years.

109.     By prohibiting Safariland from competing against Axon—in terms of products and services Safariland can offer as well as customers Safariland can solicit—these provisions harmed customers who would otherwise benefit from potential or actual competition by Safariland, including specifically in the markets for BWC systems and their components.  By

prohibiting Axon and Safariland from affirmatively soliciting each other's employees, these provisions eliminated a form of competition to attract skilled labor and thereby tended to reduce quality, service, and innovation, including specifically in the markets for BWC systems and their components.

110.    The noncompete agreements were not reasonably limited in scope to protect a legitimate business interest.  A mere general desire to be free from competition is not a legitimate business interest.  The noncompete agreements went far beyond any intellectual property, goodwill, or customer relationship necessary to protect Axon's investment in VieVu. Moreover, even if a legitimate interest existed, the lengths of the noncompetes were longer than reasonably necessary, because they prevented Safariland and Axon from competing for products and services, customers, and employees for 10 years or longer.

### 3.    Defendants' Conduct Has Caused Substantial Anticompetitive Effects

111.    Since the VieVu acquisition and related noncompete agreements with Safariland, Axon has faced no threats to its dominance in the Markets.  Axon remains the market leader of both long-range CEWs and BWC systems, with 90% of the long-range CEW market and approximately 70%-85% of the BWC system market.[78] Through its acquisition, market-allocation, and noncompete agreements, Axon has effectively prevented rivals from challenging its monopoly power.

112.    Moreover, since the Merger, Axon has continued to foreclose competition in the Markets through anticompetitive contracting practices.  These include the long-term (5- to 12-year) supply agreements it imposes on police departments for both BWC systems and long-range

---

[78] Duprey, *supra* note 11.

CEWs, and its bundling of BWC systems and long-range CEWs.  These practices raise barriers to entry and make it more difficult for rival BWC system and long-range CEW providers to break Axon's stranglehold on the Markets.

113.    The Merger eliminated intense price and innovation competition between Axon and VieVu in the BWC systems market.  The result has been higher prices, and reduced quality, service, and innovation.

114.    As described above, Axon and VieVu were each other's closest competitors. Industry analysts observed that the Merger would entrench Axon's monopoly, predicting, for example, that "[t]he combination of the two largest providers of the recording devices will create a dominant force in police surveillance"[79] and that "[t]here is going to be no stopping Axon Enterprise . . . now that it has acquired its main body camera rival VieVu."[80]

115.    As described above, before the Merger, Axon and VieVu vigorously and consistently competed on price in an effort to win contracts, including with some of the largest metropolitan police departments.  This competition resulted in substantially lower prices.  To take just one example, in a blind bidding process, VieVu's bid for the NYPD contract was *$6.4 million* compared to Axon's *$17 million.*

116.    VieVu's lower pricing caused Axon to reduce its own bids.  VieVu at times responded to Axon's competing bids by offering better terms.

117.    Axon and VieVu also competed vigorously on non-price aspects of BWC systems, including the development of various innovative features such as auto-activation of BWCs in the event of an officer unholstering a gun or Taser, and computer-assisted facial

---

[79] Brustein, supra note 71.

[80] *See* Duprey, *supra* note 11.

redaction tools for DEMS videos.  Consumers benefited from this innovation competition.

118.    Post-Merger, customers lost the benefit of this head-to-head price and innovation competition, and Axon began to exercise its pricing power, enacting "substantial price increases . . . including on body cameras and on the Taser weapon," according to a source cited in the FTC's complaint.[81]

119.    The prices Axon charges for BWC systems have shot up dramatically as a result of the Merger.  This is shown by Axon's own 10-K filings with the SEC.  Notably, these filings show that Axon's average selling price for BWCs (calculated as revenue per unit sold) *declined* from $195.17 in 2016 to $169.07 in 2017, the last year before the Merger, while VieVu was still vigorously competing with Axon, even as Axon sold substantially more BWCs in 2017 than in 2016.  But Axon's revenue per BWC sold jumped to *$254.56* in 2018, the year of the Merger— an increase of *34%*—even though Axon sold roughly the same number of BWCs that year as in 2017.  And its average BWC price has relentlessly continued to increase since then, rising to *$290.69* in 2019, *$313.09* in 2020, *$415.52* in 2021, and *$489.80* in 2022—a nearly *threefold* increase from 2017, the year before the Merger.  (By comparison, Apple's base iPhone MSRP has gone up only from $699 to $799 from 2017 to 2023 despite many feature improvements over that period.)  The following graph illustrates this stark trend:

---

[81] FTC Compl. ¶ 42.



120.    Prices for Docks exhibit a similar pattern.  Axon's 10-K reports show that the average price for its Docks *decreased* from $437.03 in 2016 to $414.44 in 2017, the year before the Merger. That increased to *$602.75* in 2018, the year of the Merger (a ***45%*** increase), and then *$918.02* in 2019 (a ***122%*** increase from 2017).  By 2022, the average price was $1,043.06, well over twice as expensive compared to 2017.

121.    Prices for Axon's DEMS have also increased, as is demonstrated by price quotes and contracts with local governments from before and after the Merger.  For example, in 2017 Axon offered four Pro Evidence.com licenses to Fayetteville, Arkansas, at an effective rate of

$243.34 per license per year for five years (net of discounts).  In 2020, however, Axon offered two Pro Evidence.com licenses to another local government for an effective rate of $468 per license per year for five years—nearly twice the effective 2017 price.

122.     Further evidence that the Merger has led to supracompetitive prices comes from Axon's reported profit margins on BWCs.  Indeed, these margins follow a trend nearly identical to Axon's BWC prices from 2016 to 2022.  Axon's reported gross margin on "hardware" in its "Software and Sensors" segment (the term it uses for its BWC business) was 17.6% in 2016 and just 10.5% in 2017, when VieVu was competing intensely with it.  That figure (later reported as "product gross margin," as opposed to "service margins," for the Software and Sensors segment) then jumped to 20.8% in 2018, *29.8*% in 2019, *36.6*% in 2020, *39.2*% in 2021, and *42.1*% in 2022—a ***fourfold*** increase from 2017, as shown in the following graph:



123.     This profit margin data shows that the increase in Axon's BWC prices after the Merger is not due to increased costs (to the extent they increased at all).

124.     Since the Merger, Axon has likewise raked in eye-popping gross margins on its

DEMS business—74.6% in 2021, and 73.3% in 2022, for example, according to its 10-K filings.

125.    Existing BWC system providers have not replaced the competition that was lost as a result of the Merger between Axon and VieVu, which were the two closest competitors in the relevant market.  While each remaining competitor has different strengths and weaknesses, each competitor faces real and significant challenges in replacing competition lost through Axon's merger with VieVu.  These challenges include, but are not limited to, reputation or lack of references from large, metropolitan police department customers, service levels that are inadequate for such customers, and software with limited functionality.

126.    The challenges faced by these competitors are even greater because of the clout Axon has with police departments from its Taser product.  Axon has acknowledged that this is a "key" "[d]ifferentiator" that sets Axon apart, bragging in a 2019 investor presentation that "Taser success drives customer access" more broadly and that "17,000 out of 18,000 US police agencies procure Taser devices."[82]   Axon further acknowledged that it "leveraged its deep agency relationships and Taser's strength to establish the market lead in body cameras & software."[83]

127.    Moreover, some of the other BWC system providers price significantly higher than VieVu and have not sufficiently replaced VieVu's aggressive pricing.  As the analysis of Axon's prices above demonstrates, the remaining firms in the relevant market have not replaced the competitive constraint of VieVu's lower-priced offerings.

128.    Axon's price increases have been highly profitable for it.  Its annual unit sales of BWCs and DEMS have increased significantly since the Merger despite its higher prices.  It is clear, therefore, that Axon has been able to impose and profitably sustain a significant non-

---

[82] *Investor Presentation, Axon Enterprise, December 2019*, *supra* note 48.

[83] *Id.* at 9.

transitory price increase in BWC system market since and as a result of the Merger.

129.   Defendants' anticompetitive conduct has also increased prices for long-range CEWs compared to what those prices would have been absent the Merger and Defendants' conduct.

130.   In 2014–15, Oklahoma City paid around $630,000 and $683,325 for five-year contracts of at least 305 Tasers and a BWC system with 305 body cameras (supplied by competitor WatchGuard).[84]   Under its new contract, all with Axon, it pays $28.9 million over ten years for a full supply agreement with 500 Tasers and 665 body cameras—of which, $18.7 million is allocated to Tasers and BWC systems.   These contracts represent a per-year cost increase for Tasers and BWC systems from just under $263,000 to $1.9 million, an increase of 611%, when its supply of Tasers and body cameras increased by less than 100%.

131.   Absent the Merger and Defendants' other anticompetitive conduct, entry into the long-range CEW market by Safariland would have been likelier, and this threat would have lowered prices.   As noted above, Axon's own CEO's comment that the Merger's noncompete provision with respect to long-range CEWs was a "hidden jewel" of the Merger indicates that Axon itself viewed entry by Safariland into the long-range CEW market as a real threat.[85]

132.   Axon has acknowledged the negative impact of price increases on budget constrained law enforcement officers and communities: "It's no secret that budget constraints are a constant inconvenience for law enforcement agencies. Long needs lists + short funds = under

---

[84] Josh Wallace, *Oklahoma City Body Camera Program Full Implemented*, Oklahoman (Feb. 17, 2018),   https://www.oklahoman.com/story/news/local/oklahoma-city/2018/02/17/oklahoma-city-body-camera-program-full-implemented/60542805007/; Brian Bus, *Shock Value: OKC Selling Back Its Obsolete Tasers*, J. Record (Nov. 22, 2017), https://journalrecord.com/2017/11/22/shock-value-okc-selling-back-its-obsolete-tasers/.

[85] FTC Compl. ¶ 46.

equipped officers and potentially underserved communities."[86]

133.   Indeed, Axon's monopoly prices have priced many police departments out of the Markets.   In 2019, in an article titled, "Some U.S. police departments dump body-camera programs amid high costs," the Washington Post reported that "many departments — especially in smaller jurisdictions — are now dropping or delaying their [BWC] programs, finding it too expensive to store and manage the thousands of hours of footage"—i.e. via DEMS.[87]   The article further noted how "Axon . . . said every one of its clients that have canceled contracts cited costs."[88]   This type of "dead-weight loss," as economics calls it—where a monopolist's supracompetitive prices price out buyers who would otherwise buy the product if it were priced competitively—is a classic harm inflicted by monopoly power, which reduces total economic output and welfare.

134.   Axon's long-term supply contracts and bundling with respect to BWC systems and long-range CEWs have also reduced competition by foreclosing rivals from the Markets and entrenching Axon's monopoly power, which has similarly tended to increase prices in the Markets.

### C.   Lack of Countervailing Factors

#### 1.   High Barriers to Entry and Expansion

135.   Defendants cannot demonstrate that new entry or expansion by existing firms has been or would be timely, likely, or sufficient to offset the anticompetitive effects of their

---

[86] FTC Compl. ¶ 42.

[87] Kimberly Kindy, *Some U.S. police departments dump body-camera programs amid high* costs, Washington Post (Jan. 21, 2019), https://www.washingtonpost.com/national/some-us-police-departments-dump-body-camera-programs-amid-high-costs/2019/01/21/991f0e66-03ad-11e9-b6a9-0aa5c2fcc9e4_story.html.

[88] *Id.*

conduct.  *De novo* entrants into the Markets would face considerable barriers in replicating the competition that the Merger has eliminated.  Effective entry into the Markets would require substantial, costly upfront investments in creating a new BWC system or long-range CEW offering.  The system also must be designed for use by law enforcement agencies, with features such as secured layers for authorized personnel access and strict recordation of file access history for chain of custody purposes.  There are high switching costs related to the transfer of metadata for DEMS video files, and customers are sticky because moving data to a new provider and training officers on a new platform is challenging and expensive.

136.    Barriers to entry are even higher because of Axon's clout with police departments thanks to its Taser product.  As noted above, Axon has acknowledged that this clout is a "key" "[d]ifferentiator" that sets Axon apart, bragging in a 2019 investor presentation that "Taser success drives customer access" more broadly and that "17,000 out of 18,000 US police agencies procure Taser devices."  Axon further acknowledged that it "leveraged its deep agency relationships and Taser's strength to establish the market lead in body cameras & software."[89]

137.    Significant barriers to entry and expansion are confirmed by Axon's continued dominance in the Markets today despite its continuing price increases that would otherwise be expected to entice new market participants to enter or existing participants to expand.

### 2.    Efficiencies

138.    Defendants cannot show that merger-specific efficiencies would result from the Merger that will offset the anticompetitive effects.  According to the FTC, Axon's President admitted that potential efficiencies played no role in Axon's analysis of the Merger.[90]

---

[89] *Investor Presentation, Axon Enterprise, December 2019*, *supra* note 48.

[90] FTC Compl. ¶ 55.

D.        **The FTC Alleges the Merger Violates the Antitrust Laws**

139.     On January 3, 2020, the Federal Trade Commission issued an administrative complaint against Axon and Safariland alleging that the Merger "constitutes a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45."[91]   The complaint also alleges that the Merger constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.[92] The Commission vote to issue the administrative complaint was 5-0.[93]

140.     Many of the allegations from the FTC complaint are specifically incorporated and realleged herein.  The FTC complaint specifically alleges, *inter alia*, that the Merger "eliminated intense price and innovation competition between Respondent Axon and VieVu in the relevant market" and has resulted in higher prices for BWC systems.[94]

141.     The relief contemplated by the FTC complaint consists of various forms of injunctive relief, including, *inter alia*, divestiture of assets (including those acquired from Safariland) to restore the level of competition that was lost through the Merger, taking various steps to assist the divested business, and voiding all anticompetitive agreements between Axon and Safariland.

142.     On June 11, 2020, Safariland settled with the FTC.[95]   Under the terms of the

---

[91] FTC Compl. ¶ 60

[92] FTC Compl. ¶ 58

[93] *Axon Enterprise and Safariland, In the Matter of*, F.T.C. (last updated October 6, 2023), https://www.ftc.gov/enforcement/cases-proceedings/1810162/axonvievu-matter.

[94] FTC Compl. ¶¶ 7, 35,42

[95] *FTC Approves Final Order Settling Charges that Vievu's Former Parent Company Safariland Entered into Anticompetitive Agreements with Body-Worn Camera Systems Seller Axon*, FTC (June 16, 2020),     https://www.ftc.gov/news-events/news/press-releases/2020/06/ftc-approves-final-order-settling-charges-vievus-former-parent-company-safariland-entered.

settlement agreement, Safariland must obtain approval from the FTC before entering into any non-compete or similar agreements with Axon.

### E.    Defendants' Conduct Has Harmed the Class

143.    Defendants' conduct has harmed Plaintiff and other Class members who purchased BWC systems (or their components) or long-range CEWs (and associated components such as holsters) from Axon after the Merger.  As a result of the Merger and Defendants' other anticompetitive conduct, Class members have paid inflated prices for these products and services.  Class members have also suffered from reduced quality, service, and innovation in the Markets because of Defendants' conduct.

## V.    CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action on behalf of itself and, pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who have directly purchased any of the following from Axon (or, with respect to long-range CEW accessories or components, from Safariland) in the United States from May 3, 2018 until the effects of Defendants' unlawful conduct cease (the "Class Period"): (1) a BWC system or any component of a BWC system, (2) a long-range CEW or related accessories or components such as holsters, and/or (3) BWC system– or long-range CEW–related services such as warranties.

145.    The following are specifically excluded from the Class: Defendants; the officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants.  Also excluded from the Class are: any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

146.    Members of the Class are so numerous and geographically dispersed that joinder

45

is impracticable.  Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

147.   Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

148.   Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

149.   Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation.

150.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

    a.   whether the Merger substantially lessened competition and/or tended to create a monopoly;

    b.   the definitions of the relevant markets;

    c.   whether, through the conduct alleged herein, Axon willfully acquired, maintained, and/or enhanced its monopoly power in the Markets in the United States;

    d.   whether Axon unlawfully attempted to monopolize the relevant markets;

    e.   whether Defendants unlawfully conspired to monopolize the relevant markets;

    f.   whether Defendants' conduct caused Class members to suffer antitrust injury and, if so, the appropriate measure of damages; and

g.  whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

151.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

152.  The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

153.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

154.  Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

155.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

156.  Plaintiff has defined members of the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.   TOLLING OF STATUTE OF LIMITATION

157.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

158.   The federal government's initiation of its antitrust investigation of Defendants' unlawful conduct operates to toll any federal statute of limitations under 15 U.S.C. § 16.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18
### (Axon & Safariland)

159.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

160.   The merger of Axon and VieVu was a stock acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

161.   The effect of this acquisition has been to substantially lessen competition and to tend to create a monopoly in the Markets in the United States, in violation of Section 7 of the Clayton Act.

162.   The relevant product and geographic markets consist of BWCs systems and their components, long-range CEWs and related components and accessories such as holsters, and related services (for both BWC systems and long-range CEWs) such as warranties sold in the United States.

163.   The Products are not reasonably interchangeable with any other products in the United States.  There is no reasonably interchangeable product that would effectively constrain, or has effectively constrained, Axon from imposing and profitably sustaining a small but significant nontransitory price increase.

164.   High barriers to entry and expansion have made it impossible for a competitor to

enter the Markets to compete with Axon and restrain its monopoly power despite dramatic price increases.

165.    Axon has and controls an estimated 85% of the BWC systems market and an estimated 95% of the long-range CEW market.

166.    As a result of Axon's conduct in violation of Section 7 of the Clayton Act, Plaintiff and the Class have been injured and have paid artificially inflated prices for the Products.

167.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendant preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**Conspiracy in Restraint of Trade (Axon & Safariland)**

168.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169.    Axon entered into a number of agreements with Safariland that have reduced competition, output, and innovation and raised prices above competitive levels in the Markets.

170.    These agreements lacked offsetting procompetitive benefits.

171.    Defendants' anticompetitive acts have injured and will continue to injure competition in this market.

172.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

173.    Defendants' conduct has caused Plaintiff and all other similarly situated persons or entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

174.    Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

175.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the BWC Systems Market (Axon)

176.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

177.    The relevant product and geographic market consists of BWCs systems and their components sold in the United States.

178.    Before and after the Merger, Axon has had and continues to have monopoly power in the relevant market.

179.    Axon willfully obtained and maintained its monopoly power through the Merger and other anticompetitive conduct, including its long-term supply agreements and bundling.

180.    Axon's conduct has had substantial anticompetitive effects.  It has raised prices for the Products above the competitive level and otherwise injured competition without any offsetting procompetitive benefit.

181.    Axon's anticompetitive acts have injured and will continue to injure competition in this market.

182.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

183.     Axon's conduct has caused Plaintiff and all other similarly situated persons or entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

184.     Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Axon's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

185.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Axon preventing and restraining the violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the BWC System Market (Axon)**

186.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

187.     The relevant product and geographic market consists of BWCs systems and their components sold in the United States.

188.     If Axon does not already have monopoly power in the United States for BWC systems, Axon has attempted to monopolize this market.   Axon attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of: a) foreclosing competition in the market for BWC systems; and b) inflating the price of BWC systems.

189.     As described in more detail above, with its purchase of VieVu, Axon attempted to acquire and maintain market power through anticompetitive conduct.

190.     As described above, Axon's practice of bundling BWC system supply with long-

51

range CEW supply attempted to suppress competition in the BWC system market.

191.    As described above, Axon's practice of forcing purchasers to sign long-term contracts attempted to suppress competition in the BWC system market by preventing would-be competitors from entering the market.

192.    The anticompetitive conduct described here, undertaken by Axon, creates a dangerous probability that Axon will achieve monopoly power in the BWC system market.

193.    Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

194.    As a direct and proximate result of Axon's continuing attempted violation of Section 2 of the Sherman Act, prices of BWC systems in the U.S. have been and continue to be inflated, fixed, and stabilized, causing injury to Plaintiff and members of the Class.

195.    Axon's anticompetitive acts have injured and will continue to injure competition in this market.

196.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

197.    Axon's conduct has caused Plaintiff and all other similarly situated persons or entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

198.    Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Axon's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

199.    Plaintiff and members of the Class are entitled to treble damages and an

injunction against Defendant preventing and restraining the violations alleged herein.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the BWC System Market (Axon & Safariland)**

200.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

201.    Defendants entered into and engaged in an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in exclusionary conduct designed to prevent competition on the merits in the relevant market for BWC systems.

202.    Specifically, in exchange for Axon's purchasing VieVu and signing the Holster Agreement, Safariland agreed to withdraw from the market for BWC systems and not to re-enter, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well situated to compete on price and innovation.

203.    Overt acts in furtherance of this conspiracy consisted of, inter alia: (a) the unlawful customer and product market-allocation agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the BWC system market or solicit Axon's customers or employees, and (b) the unlawful acquisition of VieVu on May 3, 2018 by which Safariland agreed to withdraw from the BWC system market.

204.    Defendants engaged in this with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits.

205.    Defendants' anticompetitive and unlawful conduct proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Safariland on price, promotional activity, and innovation.  This conduct has reduced consumer choice and allowed Axon to raise, maintain, or stabilize the prices of BWC systems sold to purchasers in the United

States.

206.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

207.    Defendants' conduct has caused Plaintiff and all other similarly situated persons or entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

208.    Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

209.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the Long-Range CEW Market (Axon)

210.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

211.    The relevant product market is the long-range CEW market, as set forth herein.

212.    The relevant geographic market is the United States.

213.    Axon possesses monopoly price-setting power in the United States for long-range CEW supply.   Axon acquired and maintains that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have, and did actually have, the effect of: a) foreclosing competition in the market for long-range CEWs; and b) inflating the price of long-range CEWs.

214.    As described in more detail above, Axon's entered into an agreement with

Safariland under which Safariland agreed not to compete in the long-range CEW market.

215.    Axon further used long-term contracts and bundling to prevent entry by would-be competitors and thus to suppress competition.

216.    Axon's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

217.    As a direct and proximate result of Axon's continuing violation of Section 2 of the Sherman Act, prices of long-range CEWs in the U.S. long-range CEW market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

218.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

219.    Axon's conduct has caused Plaintiff and all other similarly situated persons or entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

220.    Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Axon's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

221.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendant preventing and restraining the violations alleged herein.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Long-Range CEW Market (Axon)**

222.    Plaintiff incorporates and realleges, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

223.    The relevant product market is the long-range CEW market, as set forth herein.

224.    The relevant geographic market is the United States.

225.    If Axon does not already have monopoly power in the United States for long-range CEWs, Axon has attempted to monopolize this market.  Axon attempted to possess monopoly price-setting power in the United States for long-range CEW supply.  Axon attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of: a) foreclosing competition in the market for long-range CEWs; and b) inflating the price of long-range CEWs.

226.    As described in more detail above, Axon's non-compete agreements with Safariland attempted to prevent would-be competitors and suppress competition.

227.    Axon's long-term contracts and bundling attempted to prevent would-be competitors from entering the long-range CEW market and suppressed competition.

228.    Axon's anticompetitive conduct creates a dangerous probability that Axon will achieve monopoly power in the long-range CEW market.

229.    Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

230.    As a direct and proximate result of Axon's attempted violation of Section 2 of the Sherman Act, prices of long-range CEWs have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

231.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

232.    Axon's conduct has caused Plaintiff and all other similarly situated persons or

entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

233.     Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Axon's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

234.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Axon preventing and restraining the violations alleged herein.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the Long-Range CEW Market (Axon & Safariland)**

235.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

236.     The relevant product market is the long-range CEW market, as set forth herein.

237.     The relevant geographic market is the United States.

238.     Defendants entered into an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act by engaging in exclusionary conduct designed to prevent competition in the relevant market for long-range CEWs.

239.     Specifically, pursuant to the Holster Agreement, Safariland agreed not to enter the long-range CEW market in exchange for Axon's pledge to make Safariland a preferred Taser holster supplier, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well situated to compete on price and innovation.

240.     Overt acts in furtherance of this conspiracy consisted of, inter alia: the unlawful non-compete agreements between Axon and Safariland entered into on May 3, 2018 by which

Safariland agreed not to compete in the long-range CEW market or solicit Axon's customers or employees in exchange for the preferred treatment of the Holster Agreement and Axon's purchasing VieVu.

241.    Defendants entered into and effectuated this agreement with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits in the long-range CEW market.

242.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

243.    Defendants' conduct has caused Plaintiff and all other similarly situated persons or entities to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

244.    Plaintiff and all other similarly situated persons and entities are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

245.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

October 13, 2023                      Respectfully submitted,


                                      */s/ Eric T. Kanefsky*
                                      Eric T. Kanefsky (N.J. Bar No. 024292002)
                                      Ralph J. Marra, Jr. (N.J. Bar No. 020761978)
                                      Thomas R. Calcagni (N.J. Bar No. 044801997)
                                      Martin B. Gandelman (N.J. Bar No. 015592011)
                                      CALCAGNI & KANEFSKY LLP
                                      1085 Raymond Boulevard, 14th Floor
                                      Newark, New Jersey 07102
                                      Telephone: (862) 397-1796
                                      Fax: (862) 902-5458
                                      eric@ck-litigation.com
                                      rmarra@ck-litigation.com
                                      tcalcagni@ck-litigation.com
                                      mgandelman@ck-litigation.com


                                      Sharon K. Robertson (N.J. Bar No. 030642006)
                                      Christopher Bateman (*pro hac vice* forthcoming)
                                      COHEN MILSTEIN SELLERS & TOLL PLLC
                                      88 Pine Street, 14th Floor
                                      New York, NY 10005
                                      Tel: (212) 838-7797
                                      srobertson@cohenmilstein.com
                                      cbateman@cohenmilstein.com


                                      Daniel H. Silverman (*pro hac vice* forthcoming)
                                      COHEN MILSTEIN SELLERS & TOLL PLLC
                                      769 Centre Street | Suite 207
                                      Boston, MA 02130
                                      Tel: (617) 858-1990
                                      dsilverman@cohenmilstein.com


                                      *Attorneys for the Mayor and City Council of*
                                      *Baltimore and the Proposed Class*

## LOCAL RULE 11.2 CERTIFICATION

The undersigned hereby certifies, pursuant to 28 U.S.C. § 1746, that the within action is not the subject matter of any other actions in this Court or any other Court, or of any pending arbitration or administrative proceeding, except as follows:

1. *Township of Howell, Monmouth County, New Jersey v. Axon Enterprise, Inc. amd Safariland, LLC*, Case No. 23-cv-07182 in the United States District Court for the District of New Jersey;

2. *City of Augusta, Kennebec County, Maine v. Axon Enterprise, Inc. and Safariland, LLC*, Case No. 23-cv-20897 in the United States District Court for the District of New Jersey;

3. *In the Matter of Axon Enterprise, Inc. and Safariland, LLC*, Case No. D9389 before the Federal Trade Commission.[96]

I further certify that no other action is contemplated and that the matter in controversy is not the subject of any arbitration proceedings.

I certify that the foregoing statement made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: October 13, 2023

*/s/ Eric T. Kanefsky*
Eric T. Kanefsky

---

[96] On October 10, 2023, the Federal Trade Commission dismissed the complaint and returned the matter to adjudication.